IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE: EARL DEVOE ROUSE, JR. and          CASE NO.: 5:17-bk-72254
STEPHANIE MARIE ROUSE, DEBTORS        CHAPTER 7

RON BROWN                             PLAINTIFF

V.                   AP NO.: 5:18-ap-07075

EARL DEVOE ROUSE, JR., and            DEFENDANTS/DEBTORS
STEPHANIE MARIE ROUSE

## MEMORANDUM OPINION

Before the court is a *Complaint to Deny Discharge Pursuant to 11 U.S.C. § 727 and to Determine Dischargeability of Debt Pursuant to 11 U.S.C. § 523* ("Complaint") filed by Ron Brown ("Brown") on November 30, 2018, at docket entry 1. The debtors, Earl Devoe Rouse, Jr. ("Mr. Rouse") and Stephanie Marie Rouse ("Mrs. Rouse") (collectively, "debtors"), filed their *Answer to Complaint* on September 23, 2020, at docket entry 63. This matter came on for trial on September 12, 2023, the parties appearing personally and by and through their counsel, and concluded on October 11, 2023, with closing arguments. The court thereafter took the matter under advisement. For the reasons stated herein, the relief sought in the Complaint is denied.

### I. Jurisdiction

This court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I), and (J). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## II. Findings of Fact

### A. Introduction

Brown and the debtors enjoyed a symbiotic business relationship that spoiled, resulting in a state court lawsuit and judgment favorable to Brown. In addition to damages, the judgment contemplated future financial benefits to Brown based on anticipated commissions. In his Complaint, Brown seeks to reexamine prejudgment lost commissions, recover anticipated and unpaid future commissions, and render the expanded state court judgment nondischargeable. Additionally, Brown attacks the debtors' entire discharge based principally on alleged false oaths or accounts in their schedules.

#### 1. Marketing Specialist Group

The debtors did business as sole proprietors of an unincorporated entity called Marketing Specialist Group ("MSG") with a mailing address that mirrored their home address in Springdale, Arkansas. (Plaintiff's Exhibit 1, at 4.) They scheduled the business as "[c]onsulting" and reported the "[d]ates business existed" as 2010 to August 2017, an era ending right before their September 2017 bankruptcy filing. (Pls.' Ex. 2, at 60.)

MSG worked on a commission basis and concentrated on manufacturers that wanted entrée to Walmart Stores ("Walmart") for distribution purposes.[1] MSG's goal was to walk the client through the process and get them in front of the appropriate Walmart buyer.

The dispute between the debtors and Brown involved one client, VP Racing Fuels, Inc. ("VP"). MSG entered into a Sales Representation Agreement with VP dated April 18, 2013. (Defendants' Exhibit 3.) Essentially, MSG supplied marketing services for a 5% commission "of

---

[1] The Walmart brand originated in Rogers, Arkansas and retains a massive corporate presence there.

the net invoice amount on sales." (Defs.' Ex. 3, at 1.) The product in question serviced small yardwork engines.

### 2. MSG and Brown

Brown was the debtors' barber and hairdresser; this matured into a business relationship when MSG and Brown entered into a Contract Agreement effective November 7, 2013. (Defs.' Ex. 1.) The Contract Agreement provided that commissions on assigned accounts, including VP, would be split on an equal percentage basis. (Defs.' Ex. 1, at 2.) Although the MSG/VP relationship predated the effective date of the Contract Agreement, informally Brown had been involved in developing VP as an MSG customer.

Mr. Rouse testified that the debtors terminated their contractual relationship with Brown in May or June 2016 based on complications Brown caused with VP. Specifically, Mr. Rouse stated that Brown tried through a third party to take over and represent VP without MSG and gave his brother proprietary information. The debtors directed Brown to cease contacting VP, but, according to the debtors, Brown continued to do so. As a result, the debtors filed a breach of contract lawsuit against Brown in state court.

### B. Judgment

### 1. State Court Suit

The deteriorating relationship resulted in the debtors suing Brown and Tony Caire ("Caire")[2] in the Circuit Court of Washington County, Arkansas in May 2016. Both defendants counterclaimed. A two-day trial in April 2017 resulted in a verdict unfavorable to the debtors. Specifically, the jury awarded Brown damages for breach of contract in the amount of $38,990.03

---

[2] For purposes of this opinion, matters pertinent to Caire are generally ignored. Other than being mentioned, he was not a participant in the trial before this court, and matters relating to him did not play a significant role in this trial.

3

and made findings relative to his claim for future commissions. (Pls.' Ex. 6, at 2.) The state court entered an initial Judgment in May 2017 which contained jury findings but was not fully expositive with respect to damages. (Pls.' Ex. 6.)

The state court entered a clarifying Amended Judgment on June 7, 2017. (Pls.' Ex. 7.) The Amended Judgment awarded Brown judgment against the debtors d/b/a MSG in the amount of $38,990.03 for breach of contract, prejudgment interest in the amount of $1,858.90, attorney's fees of $16,531.63, and costs in the amount of $190.00, for a total judgment of $57,570.56, to bear post-judgment interest at the rate of 10% per annum until paid. (Pls.' Ex. 7, at 2.) Further, the debtors d/b/a MSG were "ordered to direct payment to Ron Brown in the amount of 33% of all gross commissions received on the first three products placed in Walmart until they are no longer sold." (Pls.' Ex. 7, at 3.)

The state court proceeding transpired during a previous bankruptcy the debtors filed in the Western District of Arkansas on August 18, 2014. (Pls.' Ex. 1, at 3; Pls.' Ex. 8a.) This filing is relevant only insofar as the bankruptcy court, after the state court judgment, ordered an escrow arrangement concerning future commissions which required that two-thirds of any subsequent VP commissions were to be placed in an escrow account maintained by the debtors' counsel. The parties did not introduce any evidence of the status or disposition of the debtors' 2014 bankruptcy. On August 29, 2017, after the Amended Judgment and shortly before the debtors' September 2017 bankruptcy, Brown's attorney picked up a check in the amount of $33,709.61 from the escrow account, as memorialized by a Client Document Pick Up Form (the "Form"). (Defs.' Ex. 6.) Mrs. Rouse testified that this represented everything from the 2014 case.

### 2.   VP – Termination

After the adverse result in state court, Mr. Rouse testified that he and VP mutually agreed to terminate their Sales Representation Agreement effective August 31, 2017.  Mr. Rouse blamed the ongoing dispute with Brown; he testified that Brown's lawyers were aggressive toward the debtors, tried to get VP to pay Brown directly, and caused difficulties between VP and MSG.

### C.   2017 Bankruptcy Filing

Shortly after the June 2017 Amended Judgment, Brown's collection in August of the escrowed funds, and the August termination of the VP/MSG relationship, the debtors on September 6, 2017, jointly filed pro se their chapter 13 reorganization case.  (Pls.' Ex. 1.)  They each listed assets and liabilities between $100,001 and $500,000.  (Pls.' Ex. 1, at 6.)  Later, the case converted to a chapter 7.  The parties did not introduce any evidence of when or on what basis the chapter 13 converted to a chapter 7 other than an inference that Brown participated in that result.  Thereafter, Brown filed his Complaint seeking to deny the debtors their discharge with respect to Brown and generally.  Brown also seeks additional damages which both predate and postdate entry of the Amended Judgment.

### D.   Damages and the Amended Judgment

Brown seeks additional damages for alleged pre- and post-Amended Judgment conversion of VP commissions owed him.  Conversely, the debtors contend that the Amended Judgment has been satisfied in full, including any pre- or post-Amended Judgment commissions, which renders dischargeability moot.  Basically, the parties dispute whether an additional award is justified and whether and to what extent the Amended Judgment is satisfied.

1.  Pre-Amended Judgment Damages – VP Commissions

Brown introduced evidence concerning VP receivables and the debtors' expenditures prior to the state court trial and Amended Judgment for two purposes.  First, Brown in his Complaint seeks "actual and punitive damages" based on "state law causes of actions including, but not limited, to [conversion], larceny, embezzlement, and fraud or defalcation while acting in a fiduciary capacity." (Complaint, Nov. 30, 2018, ECF No. 1, at ¶ 1.)  Specifically, Brown alleges that in the debtors' 2014 bankruptcy case they "unlawfully received commissions owed to the Plaintiff and [did] not disclose receipt of such funds to the Chapter 13 Trustee or this Court in that bankruptcy case in the approximate amount of $112,000.00."  (Compl. at ¶ 10.)  Second, Brown introduced said evidence to demonstrate tortious conduct sufficient to satisfy the elements of a willful and malicious dischargeability cause of action.

Brown proved neither.  First, Brown failed to introduce any evidence supporting his allegation of an undisclosed $112,000—or any other sum—the debtors supposedly received pre-Amended Judgment in the context of their 2014 bankruptcy case.  Second, Brown introduced insufficient evidence of pre-Amended Judgment conduct other than what would constitute a breach of contract dispute between two parties arguing over whether commissions were due and owing.  An implication that the debtors were spendthrifts and spent significant amounts of money during this period on vacations, clothing, and cash withdrawals does not suffice.  The more credible testimony is that the debtors paid Brown his share of VP commissions through March or April 2016, with no payments thereafter.  This timing coincides with Mr. Rouse's testimony that he terminated MSG's relationship with Brown and promptly sued Brown in May 2016.  Brown counterclaimed and won, resulting in the Amended Judgment.  The Amended Judgment subsumed and compensated the portions aliquot to Brown based on breach of contract for any VP

6

commissions through the state court trial in May 2017.  Brown introduced no evidence proving

otherwise.

2.   Brown's Claim for Post-Judgment Damages – VP Commissions

The Washington County Circuit Court entered a clarifying Amended Judgment on June 7,

2017.  The Amended Judgment reiterates the fixed damage award and then orders the debtors d/b/a

MSG "to direct payment to Ron Brown in the amount of 33% of all gross commissions received

on the first three products placed in Walmart until they are no longer sold."  (Pls.' Ex. 7, at 3.)

At, about, and after the entry of the Amended Judgment, VP made the following

commission payments to MSG:

| Date of Bill | Date of Check | Amount of Check |
|---|---|---|
| May 2017 | 6/22/2017 | $9,178.17 |
| May 2017 | 6/23/2017 | $4,589.09 |
| June 2017 | 7/7/2017 | $8,699.02 |
| June 2017 | 7/7/2017 | $4,349.51 |
| July 2017 | 8/4/2017 | $4,902.30 |
| July 2017 | 8/8/2017 | $2,451.15 |
| August 2017 | 10/3/2017 | $7,810.64 |
| September 2017 | 10/3/2017 | $4,112.77[3] |

(Pls.' Ex. 9, at 3-10.)

During closing, Brown's counsel posited a theretofore unquantified calculation of post-

Amended Judgment damages in the amount of $15,364.21, which constitutes an admission and

part of the record.  Brown apparently arrived at this figure by adding together the VP payments to

MSG from June through October 2017 above and dividing the sum by three to arrive at an amount

presumably owed Brown.

---

[3] Mrs. Rouse testified they did not get these last two checks until November.

### 3.  Total Debt Calculation

To recap, the amount owed Brown based on this record is a total judgment of $57,570.56. Addition of the $15,364.21 figure quantified during closing for post-Amended Judgment commissions results in a total indebtedness of $72,934.77, a portion of which would bear interest only from the date of any judgment entered by this court.

### 4.  Credits and Balance

The $72,934.77 represents the full Amended Judgment award.  There is no evidence of any additional damages before or after entry of the Amended Judgment.  Brown failed to prove any of his state law causes of actions or commensurate damages either pre- or post-Amended Judgment.

 The debtors, however, contend they have paid the Amended Judgment, including prospective commissions, in full.  This compels a determination of the outstanding balance. Unfortunately, calculations in this instance may be inherently flawed.  Timing, both as to accrual and payment, is not exact.  Without a credible forensic accounting, the court cannot calculate the accrual of interest against a declining balance with irregular and unquantified credits.

Further, the record is anecdotal with a resulting lack of clarity.  Mrs. Rouse testified that in June 2017 some VP receivables were deposited into the escrow account maintained by the debtors' attorney; in reviewing Brown's Exhibit 9, an accounting prepared by a VP representative, Mrs. Rouse identified a $9,178.17 check as one paid to their attorney and not the debtors.  (Pls. Ex. 9.) She also made reference to approximately $10,000 transferred from a Bank of America account to the escrow account, as well as one cash deposit of $10,936.12 and three different checks of unspecified amounts, in June 2017.  From Brown's Exhibit 9, Mrs. Rouse estimated that a little more than $33,000 from VP had been put into the escrow account.  (Pls.' Ex. 9.)  Regardless of the ingredients, this last number likely represents the aggregate escrow amount as discussed herein.

8

The Form provides some clarity. (Defs.' Ex. 6.) The Form indicates that Brown's attorney on August 29, 2017, after the Amended Judgment and shortly before the debtors' September 2017 bankruptcy, picked up a check in the amount of $33,709.61 from the escrow account, of which Brown received half. Presumably, Caire also received half. A Settlement Sheet for Ron Brown ("Settlement Sheet") dated February 23, 2018, between Brown and his attorneys reflects a disbursement to Brown of $16,854.80 plus a $5,000 "Refund of Cash." (Pls.' Ex. 11.) This Settlement Sheet also reflects payment of expenses and attorney's fees, but these amounts should not be debited from Brown's recovery because the recovery he seeks is restricted by the attorney's fee and costs awards set forth in the Amended Judgment. The $5,000 "Refund of Cash" to Brown was not amplified by either party. The only credible explanation is that it may represent Brown's portion of one of the approximately $10,000 cash deposits referenced in Mrs. Rouse's testimony. Regardless, because it is included on the Settlement Sheet for Brown with his attorneys, it should represent a credit against the Amended Judgment.

The $33,709.61 receipt generally comports with the debtors' Exhibit 5 which shows a series of payments to independent contractors and appears to represent payments to Brown and Caire from the "Martin Attorney's Trust Fund [for] $33,715.61[4] for May, June, July, & Aug[ust] 2017 commissions." (Defs.' Ex. 5, n.1.) The same exhibit reflects independent contractor payments of $7,810.64 in September and $4,112.77 in October. Mrs. Rouse testified that these two checks were not received until November 2017, which postdates the debtors' bankruptcy filing and thus became property of the estate. A footnote in the exhibit reflects that these two checks for September and October 2017 were accordingly paid to the chapter 7 trustee in January 2018. (Defs.' Ex. 5, n.2.) Mrs. Rouse testified that there were no further receivables from VP thereafter.

---

[4] A small discrepancy ignored for purposes of these calculations.

Between what was obtained by Brown's attorneys from the escrow account and what was paid to the chapter 7 trustee, Mrs. Rouse testified that all post-Amended Judgment VP receivables were accounted for in the approximate amount of $45,639.02.

Mrs. Rouse is correct.  This record conclusively accounts for all post-Amended Judgment VP commission receivables up to termination of that relationship in August 2017.  From the escrow alone Brown received more than his $15,364.21 share posited by his attorney as the total of post-Amended Judgment commissions owed.  Brown did not introduce any evidence of unaccounted future commissions owed him as per the Amended Judgment.

This, however, does not conclude the post-Amended Judgment inquiry.  At trial, Brown raised two additional issues.  First, relying on the future commission language in the Amended Judgment, Brown believes that this court can award damages in perpetuity against VP for VP products still sold in Walmart stores.  The facts do not justify this illusion.  MSG terminated its agreement with VP effective August 2017, right before the debtors' current bankruptcy.  Brown introduced no facts supporting any additional commissions owed.  VP is not a party to this litigation, and this court is powerless to order it to do anything in this context.  Plus, as discussed below, the chapter 7 trustee resolved with VP any claim for contractual damages.  Brown appears to have shared in that settlement.

Second, Brown felt MSG owed commissions for three VP products regardless of size.  Brown produced photographs of VP products in varying sizes still being sold in Walmart as late as January 2023.  Ignoring the res judicata and collateral estoppel effects of the Amended Judgment, Brown never offered any proof that this expanded definition had formed the basis of his recovery in state court either contractually, historically, or with any specificity.  He simply testified ambiguously on this point and inferred that the product size issue may have arisen after

10

the Amended Judgment.  Frankly, most of Brown's testimony seemed designed to somehow convince this court that it could order VP to pay Brown in perpetuity for products still sold on Walmart shelves.  This argument ignores the termination of the VP and MSG Sales Representation Agreement, that any benefits from that agreement were property of the estate, and that the trustee administered that asset as discussed below.

While this resolves in favor of the debtors any factual issue concerning an additional judgment for commissions post Amended Judgment, still extant is the debtors' assertion that they have paid the original judgment in full.  Mrs. Rouse prepared a document supporting her argument that only $824.50 remains outstanding under the Amended Judgment.  (Defs.' Ex. 8.)  The chart provides:

Martin Escrow Paid by Rouse/VP Racing 2/3rd's of total VP Racing Checks

| Date | Due R. Brown* | Overpaid |
|---|---|---|
| 6/6/2017 | $3,737.13 | $7,192.99 |
| 6/22/2017 | $3,063.16 | $6,115.01 |
| 7/7/2017 | $2,819.58 | $5,879.44 |
| 8/4/2017 | $1,930.64 | $2,971.66 |
| Total | $11,550.51 | $22,159.10 |

|  | *Picked up by Atty Horton from Nolan Caddell* |  |
|---|---|---|
| 8/29/2017 | | $33,709.61 |

| Date | Due R. Brown* | Overpaid |
|---|---|---|
| Sep-17 | $1,906.50 | $5,904.14 |
| Oct-17 | $1,139.05 | $2,973.72 |
| Total | $3,045.55 | $8,877.86 |

| Paycheck Periods | Garnishments | Payment |
|---|---|---|
| 9/15/2017 | $1,022.42 | $1,022.42 |
| 9/29/2017 | $1,022.42 | $1,022.42 |
| 9/29/2017 | $1,022.42 | $1,022.42 |
| Total | $3,067.26 | $3,067.26 |

| R. Brown  Disbursed | Final Compensation Pro Rata from Trustee | Payment from Trustee |
|---|---|---|
| 4/5/2021 | $4,061.31 | $4,061.31 |

| Total Over Payment | | $38,165.53 |
|---|---|---|
| Due R. Brown | | $38,990.03 |
| Balance | | $824.50 |

*Note: R. Brown was only allowed to receive commission on 3 items (out of 15 items sold)

11

(Defs.' Ex. 8.)

The document contains computations that Mrs. Rouse did not fully or credibly explain, and multiple infirmities exist.  In the first instance, Mrs. Rouse appears to believe that the debt is restricted to solely $38,990.03, a figure she derived from a proof of claim Brown filed in the debtors' bankruptcy.  That proof of claim, however, referred to and attaches as an exhibit the Amended Judgment.  (Defs.' Ex. 9.)  The debtors never objected to Brown's proof of claim, and it suffices to assert the full amount of the judgment indebtedness owed.  Mrs. Rouse's arbitrary restriction is incorrect.

Other issues present with respect to her calculations.  In essence, the debtors' Exhibit 8 broke down payments to Brown into four categories.  (Defs.' Ex. 8.)  The first category represents the $33,709.61 picked up by Brown's attorney in August 2017 from the court-ordered escrow for post-Amended Judgment commission receivables.  Mrs. Rouse argues that only $11,551.51 of that amount was owed to Brown, and accordingly he was overpaid by $22,158.10.  The payment schedule corresponds almost exactly to the payments to independent contractors (Defs.' Ex. 5), meaning Brown and possibly Caire, in May through August 2017, which also corresponds to Brown's Exhibit 9.  Mrs. Rouse posited Brown was not entitled to the full amount paid because Brown "was only allowed to receive commission on 3 items (out of 15 items sold)."  (Defs.' Ex. 8.)

Brown, however, only received half of the $33,709.61 escrowed amount.  His Settlement Sheet reflects a one-half disbursement to him of $16,854.80.  (Pls.' Ex. 11.)  That half, rather than the whole, constitutes a credit for post-Amended Judgment commissions.  (Pls.' Ex. 11.)

The second category on the chart consists of September and October 2017 payments, which were paid to the chapter 7 trustee as post-petition property of the estate, not to Brown.  This is

confirmed by the Chapter 7 Trustee's Final Account and Distribution Report Certification that the Estate Has Been Fully Administered and Application to be Discharged ("Final Report") filed November 24, 2021, at docket entry 391 in the underlying bankruptcy case. (Pls.' Ex. 10.) Specifically, under the category of "Gross Receipts," the following entry appears: "Interest in disclosed AR for VP Racing . . . $11,923.41." (Pls.' Ex. 10, at 3.) This figure represents the September and October 2017 receivables in the amount of $7,810.64 and $4,112.77 respectively, for a total of $11,923.41. There is no record that the chapter 7 trustee specifically turned these funds over to Brown or his attorneys other than as the funds may have formed a part of Brown's pro rata distribution as an unsecured creditor, an amount credited below. Accordingly, these two checks should not represent a credit against the Amended Judgment.

The third category represents garnishments totaling $3,067.26. (Defs.' Ex. 8.) This figure properly represents a credit against the Amended Judgment.

The fourth category is a distribution "Pro Rata" from the chapter 7 trustee in the amount of $4,061.31. (Defs.' Ex. 8.) The trustee's Final Report concurs that Brown received $4,061.31. (Pls.' Ex. 10, at 20.) The trustee also reports, incongruently, that Brown received $4,621.59 as a general unsecured creditor based on a $38,900 claim. (Pls.' Ex. 10, at 7.) In the absence of clarity, the latter figure is a more credible representation of Brown's pro rata distribution as a general unsecured creditor and represents a credit against the Amended Judgment.

In addition to the four categories introduced by Mrs. Rouse's document, there are other credits which should be considered. The chapter 7 trustee's Final Report shows a payment to Brown's law firm, Nolan, Caddell & Reynolds, P. A., in the amount of $1,589.78, as well as a payment to Brown care of Caddell Reynolds Law Firm in the amount of $3,974.47. (Pls.' Ex. 10, at 3.) Both resulted from respective motions to approve compromise settlements. (Pls.' Ex. 10, at

3, 16.)  Neither party introduced the motions, but the inference is that both amounts should be credits against the Amended Judgment.

Additionally, there is an interesting but inexplicably undeveloped entry in the chapter 7 trustee's Final Report that may be pertinent to this issue.  When the debtors filed their current bankruptcy, they listed an accounts receivable or commission previously earned of $2,000 from VP.  (Pls.' Ex. 2, at 9.)  The debtors exempted this balance.  (Pls.' Ex. 2, at 13.)  Under the category of "Gross Receipts," the following entry appears in the Final Report: "Cause of Action against VP Racing . . . $50,000."  (Pls.' Ex. 10, at 3.)  This entry is amplified but not fully explained on this record by a subsequent entry on the Final Report which states: "Interest in disclosed AR for VP Racing[.]  See Application for Compromise Controversy With Caire and Brown (DN 112) and Order Granting (DN 141).  Proceeds to estate after payment of exemptions and compromise will be $1974.47.  (See Footnote)."  (Pls.' Ex. 10, at 11.)[5]  In a subsequent entry, the trustee's Final Report has the following entry: "Cause of Action against VP Racing Settled. (See Footnote)." (Pls.' Ex. 10, at 12.)  The Final Report reflects the estate received $50,000.  (Pls.' Ex. 10, at 12.) The footnote refers to an adversary proceeding case number.  (Pls.' Ex. 10, at 13.)  This adversary proceeding was not discussed or amplified in the record before this court.  Brown's recovery is not specifically stated on this record unless it is one of the figures already considered above. Regardless, evidently the trustee pursued a cause of action comprising property of the estate against VP, the settlement of which included Brown.[6]

---

[5] The footnote provides "See Order granting Trustee's motion to compel DN140."  (Pls.' Ex. 10, at 13.)

[6] This court could with some diligence review the non-trial record and ascertain some of this information.  The court is reluctant to do so.  Traditionally, this court has always tried to stick with the record presented in court.  By independently exploring other pleadings and filings, the question always arises how far the court should go in exploring facts which could affect positively

14

So, from a total Amended Judgment figure of $72,934.77, the following credits are appropriate:

$16,854.80

$5,000.00

$3,067.26

$4,621.59

$1,589.78

$3,974.47

This results in a total outstanding balance under the Amended Judgment of $37,826.87. The Amended Judgment remains unsatisfied.

E.   Schedules

Brown seeks to deny the debtors their discharge based upon alleged concealment of assets, failure to keep sufficient records, failure to explain the loss of assets, and false oaths or accounts with respect to their schedules.  These allegations are premised almost exclusively on alleged hidden or diverted VP commissions.  At trial, however, Brown intimated through examination that other aspects of the debtors' schedules might be suspect.  Hence, a broader examination is necessary.

The debtors filed under oath their initial schedules on October 20, 2017, at docket entry 46 in the underlying bankruptcy case.  (Pls.' Ex. 2, at 52.)  By this time, the debtors were represented by counsel, Travis W. Story of the Story Law Firm, PLLC.  (Pls.' Ex. 2, at 68.)  The debtors in their testimony frequently blamed Mr. Story for any inaccuracies in their schedules.  Mrs. Rouse

---

or negatively the record before it.  Federal Rule of Bankruptcy Procedure 201 is an option but requires notice and an opportunity to be heard, which carries with it the same limiting concern. Accordingly, this court will not engage in researching facts outside its trial record.

15

testified that the chapter 7 trustee or the United States Trustee filed one or more adversary proceedings based on false oaths or accounts, but these proceedings were dismissed. Mrs. Rouse also testified that she compiled information to justify their expenditures from January to June 2017. (Defs.' Ex. 5.)  No further record was made of these proceedings—the merits and reasons for dismissal are unclear.

### 1.   Home

When the debtors filed their petition on September 6, 2017, they listed "[w]here you live" as 3463 Paris Lane in Springdale, Arkansas. (Pls.' Ex. 1, at 2.) The debtors exempted this property as their residence. (Pls.' Ex. 2, at 11.)

When the debtors filed their schedules on October 20, 2017, they showed that they still had ownership of the Paris Lane property valued at $180,500. (Pls.' Ex. 2, at 3.) The debtors, however, listed the same address as a *prior* address, "not . . . [w]here they live now" and indicated that they ceased living there in October 2017. (Pls.' Ex. 2, at 53.) Mrs. Rouse testified that they moved to Katy, Texas in "Octoberish" of 2017.

They repeated the $180,500 valuation when they amended their schedules in June 2018. (Pls.' Ex. 3, at 1.) Mrs. Rouse testified that she got that value from a realtor assessment, and the property was valued "as is" because of flood damage. Congruently, the debtors scheduled an uninsured loss of "[v]arious personal property" of approximately $20,000 on August 24, 2017. (Pls.' Ex. 2, at 56.) Mr. Rouse testified this loss related to lightning damage. Mrs. Rouse indicated they made some repairs to the home prior to its sale.

The chapter 7 trustee eventually sold the Paris Lane property and received $222,000. (Pls.' Ex. 10, at 3.) The trustee remitted $171,823.94 to Truity Federal Credit Union, which held liens on the property. (Pls.' Ex. 10, at 4.) The chapter 7 trustee also reported: "Trustee reached

compromise for [the debtors] to lower their exemptions in house in exchange for non-exempt equity in undisclosed personal property." (Pls.' Ex. 10, at 11.)

There is a related entry on the debtors' June 1, 2018, schedules of a cause of action of unknown value against State Farm insurance for lightning damage to their home. (Pls.' Ex. 3, at 5.) In his Final Report, the chapter 7 trustee described this asset as a "[c]ause of [a]ction for damages to prior home" in the amount of $35,000 with the notation "[t]rustee believes this asset is valueless." (Pls.' Ex. 10, at 11.) In his Final Report, the trustee recognized that the home had been sold, that this "cause of action likely transferred with it," and the trustee believed it to be "valueless to the estate." (Pls.' Ex. 10, at 12.)

### 2.   Vehicles

The debtors listed ownership of two vehicles, a Nissan Altima and a Nissan Rogue, both located at 4706 Bell Mountain Drive, Katy, Texas. (Pls.' Ex. 2, at 4.) The debtors exempted both. (Pls.' Ex. 2, at 11.) Only Mrs. Rouse is on the debt for each vehicle. (Pls.' Ex. 2, at 14.) On their amended schedules filed June 1, 2018, the Rouge remains but not the Altima. (Pls.' Ex. 3, at 2.) The debtors offered no explanation for the Altima's disappearance, but its exemption renders this irrelevant.

### 3.   Household Goods, Furnishings, and Electronics

On their October 20, 2017, schedules the debtors listed various household goods and furnishings valued at $2,046, plus other miscellaneous items, totaling a combined value of $6,421. (Pls.' Ex. 2, at 5-6, 10.) The debtors added an additional $250 in miscellaneous value for a lawnmower, garden tools, grill, and patio furniture, plus $2,250 for business related property. (Pls.' Ex. 2, at 10.) Although lacking specificity, the debtors accounted for the rest of their property in three general categories. First, the debtors reported an uninsured lightning and water loss of

"[v]arious personal property" of approximately $20,000 on August 24, 2017.  (Pls.' Ex. 2, at 56.)
Second, the debtors reported that the Washington County Sheriff's Department had possession of
their "personal property confiscated by Writ of Execution."  (Pls.' Ex. 2, at 58.)  Third, without
specifying a value—which is not called for by the question—the debtors disclosed on their
schedules that they had property in two storage facilities: one at Airtight Self-Storage described as
"[a]ll household property" and another at CubeSmart described as "[p]ersonal [p]roperty."  (Pls.'
Ex. 2, at 58.)

The miscellaneous household goods and furnishings value increased to $8,000 on the
debtors' amended June 1, 2018, schedules based on a third-party valuation described as the
Webster Valuation List.  (Pls.' Ex. 3, at 2.)  The Webster Valuation List is a letter dated April 12,
2018, attached to the amended schedules, and reflects an auctioneer's valuation of personal
property located in storage units at 25595 Westheimer Parkway.  (Pls.' Ex. 3, at 7-8.)

The trustee's Final Report contains this entry:

Undisclosed Household Goods and Furnishings[.]  Debtors did not list all of their
personal property on original schedules, although there is some overlap but difficult
to tell based on varying descriptions.  Debtors moved all personal property to TX.
Trustee reached compromise for them to lower their exemptions in house in
exchange for non-exempt equity in undisclosed personal property.  Motion to
compromise DN156 and Order granting DN170. . . . Except as to any duplication,
this entry of undisclosed personal property includes: Exhibit B to DN156- Webster
Valuation List which includes Exhibit A property on WCSO Inventory List; stove,
refrigerator, freezer, washer, dryer, microwave, dishwasher, 2 couches,
entertainment center, 3 chairs, kitchen table w/4 chairs, 1 dining table w/4 chairs, 4
DVD players, gaming system, 5 coffee tables, 2 book shelves, 2 dressers, 3 night
stands, 19"TV, 32" TV, 45" TV, 48" TV, 50"TV, king size bed, queen size bed,
outdoor patio set, dyson vacumn cleaner. - Less $2046.00 valuation of items
disclosed on original schedules.

(Pls.' Ex. 10, at 11-12.)  There is also attached a listing which represents items executed upon by
the Washington County Sheriff's Department in Arkansas as referenced in the debtors' schedules
and trustee's narrative above.  (Pls.' Ex. 3, at 11-21.)  Apparently, the chapter 7 trustee reconciled

and adjusted for the uncertainties in these inventories and locations, including damaged and garnished property, when he sold their Springdale residence and noted the offset against the homestead exemption.  (Pls.' Ex. 10, at 11.)

### 4.  Cash

The debtors listed cash in their possession as of the date of their petition, September 6, 2017, as $20.  (Pls.' Ex. 2, at 6.)  The debtors exempted this amount.  (Pls.' Ex. 2, at 12.)  This $20 amount increased on the debtors' June 1, 2018, amended schedules to $65,825 "on hand when you file[d] your petition," that is, September 6, 2017, but with an added notation that states: "Cash $25,000 in 03/2017, $16,000 in 04/2017, $24,825 in 05/2017." (Pls.' Ex. 3, at 3.)  While testifying, Mr. Rouse was unable to reconcile those figures with the original $20 entry. Mrs. Rouse did not know why the more expositive numbers were not on their earlier schedules filed in October 2017. All three dates predate their bankruptcy filing—typically not relevant to cash-on-hand on the petition date.

The trustee's Final Report, however, sheds some light on this issue as it specifically references the amended figure of $65,825 and contains the following entry:

> Undisclosed Cash[.]  Debtors filed amended schedules that disclosed this asset on Sched C at DN188.  Debtors re-amended DN 207 to delete because they claim to have amended in error--they did not have this money at the time of filing, but listed it as an asset because creditors claimed there is this amount of money unaccounted for that they should have, but the debtors claim they did not have at the time of filing.

(Pls.' Ex. 10, at 12.)  Mrs. Rouse agreed with this narrative when Brown's counsel presented it to her during examination.  Brown did not prove the debtors had this cash at filing or demonstrate its disappearance under questionable circumstances.

5.   Deposits of Money

Mrs. Rouse testified that between them personally and MSG they had three banking relationships in 2017: Bank of America, Legacy Bank, and Arvest Bank.  The debtors indicated that they closed three checking accounts in the year prior to their 2017 bankruptcy filing, two at Bank of America and one at Legacy Bank.  They reported the last balance at closing for each to be $0.  They did not disclose the dates the accounts were closed.  (Pls.' Ex. 2, at 57-58.)

The debtors listed one "[c]hecking, savings, or other financial account[]" on their initial schedules: "Arvest Bank account ending in 9048" with a balance of $5.  (Pls.' Ex. 2, at 6.)  The debtors exempted this balance.  (Pls.' Ex. 2, at 12.)  Mrs. Rouse testified that they had no other banking accounts in October 2017.  When the debtors amended their schedules on June 1, 2018, they indicated they had no checking, savings, or other financial accounts.  (Pls.' Ex. 3, at 4.)

6.   Income

For the period from January 1, 2017, to September 6, 2017, Mr. Rouse reported income of $128,677.54 and Mrs. Rouse of $126,007.75.  (Pls.' Ex. 2, at 54.)  As of October 20, 2017, approximately a month and a half after their September 6 filing, the debtors listed their income as a combined $3,782 a month with expenses of $1,545 a month.  (Pls.' Ex. 2, at 1, 49, 51.)  At filing, Mr. Rouse represented that he had been self-employed in consulting the last five years, while Mrs. Rouse was listed as unemployed.  His "monthly gross wages, salary, and commissions" were $1,650 a month plus SNAP benefits of $164 a month; her's was listed as $1,804 a month plus SNAP benefits of $164 a month, for a combined income of $3,782.  (Pls.' Ex. 2, at 48-49.)  No payroll deductions are scheduled, and unclear is the incongruity between Mrs. Rouse's monthly income and her unemployed status.  (Pls.' Ex. 2, at 48-49.)  The only increase or decrease that the debtors listed as expected within the year after filing is that the SNAP benefits would increase to

$352 in November and December 2017. (Pls.' Ex. 2, at 49.) At trial, Mr. Rouse testified that he no longer works and is on Social Security.

### 7. Statement of Income and Commitment Period

The debtors originally filed a chapter 13 reorganization and, accordingly, completed Official Form 122C-1, designed to determine their applicable commitment period and commensurate method of calculating projected disposable income. Their entries reflected an income below the median income in Arkansas, thus initiating a three-year commitment period without having to determine their disposable income under 11 U.S.C. § 1325(b)(3). Specifically, the entries mirrored the debtors' respective incomes of $1,650 and $1,804 a month for a collective monthly income of $3,454 and an annualized income of $41,448—an amount below the median income of $48,602 for a family of two in Arkansas. (Pls.' Ex. 2, at 61-63.)

In determining their "average monthly income that [they] received from all sources, derived during the 6 full months before [they filed] this bankruptcy case," the debtors were required to average their monthly income for the six months prior to filing their bankruptcy case. (Pls.' Ex. 2, at 61-63.) The debtors filed their case on September 6, 2017, approximately eight full months into the year, making March to August the appropriate time frame. The principal information adduced in that time frame is that from January 1 to the date of filing, Mr. Rouse earned from wages, commissions, bonuses, or tips $128,677.54, and Mrs. Rouse earned $126,007.75. (Pls.' Ex. 2, at 54.) Although their income varied based upon commissions, dividing Mr. Rouse's 2017 income by eight months reflects an estimated monthly income of $16,084.69 a month, while the same formula applied to Mrs. Rouse's income reflects a figure of $15,750.97 a month. Both numbers are far above the debtors' reported average over the preceding six-month period. Mr. Rouse could offer no explanation for this discrepancy other than blaming his lawyer.

There is additional anecdotal evidence of the debtors' income in 2017.  In January 2017, Mrs. Rouse worked for the Dial Corporation and received $5,910.59 in income that month.  (Pls.' Ex. 8, at 71-72.)  Mrs. Rouse testified she earned from the Dial Corporation just shy of $6,000 a month, but she was let go in August 2017.  That monthly figure is difficult to reconcile with the $126,007.75 eight-month income figure unless unquantified VP or other commission monies are considered.  Mrs. Rouse testified that she indicated on her schedules she was not employed because her employment with the Dial Corporation ceased when, after the Amended Judgment, Brown garnished their personal property in August 2017.  She indicated that she received severance pay in September 2017.  Gainsay, both months were in the six-month period prior to their September 6, 2017, filing.  Like her husband, Mrs. Rouse had no real explanation for listing $1,804 as her Schedule I income other than to blame her attorney.

Brown introduced several bank statements but, without context or a forensic review, it is difficult to determine what exact information might be gleaned from the various checking account statements that might be pertinent to this proceeding.  (Pls.' Ex. 8; Pls.' Ex. 8a.)  Compounding this is the lack of any testimony or evidence that would reduce gross numbers to net numbers, which is particularly problematic when dealing with a sole proprietorship.  This lack of clarity includes intimations of VP receivables coming in with no regard to the money going into the escrow account or to pay other commissions.  There simply is not enough information to contextualize many of these financial documents.

### III.  Analysis

#### A.  Damages

Brown seeks "actual and punitive damages" based on "state law causes of actions including, but not limited, to [conversion], larceny, embezzlement, and fraud or defalcation while

acting in a fiduciary capacity." (Compl. at ¶ 1.) The state law causes of action appear to represent alternative bases for additional damages as per the express terms of the Amended Judgment (Brown recognizing that "[t]he [Contract Agreement] terms have been subsumed by the terms of the [Amended J]udgment entered in Washington County," (Compl. at ¶ 21)), additional damages based on commissions generated in the debtors' 2014 and 2017 bankruptcies, and continuing damages despite those bankruptcies.

Specifically, sorting out damages based on the proof at trial suggests three general categories: (1) the Amended Judgment award itself plus future damages based on subsequent commissions received by MSG from VP as contemplated in the Amended Judgment, (2) damages accruing from undisclosed commissions in the debtors' 2014 and 2017 bankruptcy cases and bracketing the Amended Judgment, and, (3) thereafter, commissions Brown believes are owed him based on VP products still sold in Walmart stores. Each is discussed in turn below.

### 1. Amended Judgment

The Amended Judgment entered in state court on June 7, 2017, awarded Brown damages against the debtors in the amount of $57,570.56. The Amended Judgment also ordered the debtors "to direct payment to Ron Brown in the amount of 33% of all gross commissions received on the first three products placed in Walmart until they are no longer sold." (Pls.' Ex. 7, at 3.)

During closing, Brown's counsel posited a damage claim for post-Amended Judgment commissions in the amount of $15,364.21. (Pls.' Ex. 9.) The record fully supports this accounting of post-Amended Judgment VP commissions paid to the debtors and owed to Brown. The debtors did not credibly dispute this computation except to suggest that Brown has been paid. The debtors are correct.

Specifically, in the context of the debtors' 2014 bankruptcy, the bankruptcy court ordered an escrow arrangement that fully bracketed and included all VP commission receivables from the May trial and verdict, the June 2017 entry of the Amended Judgment, and the debtors' September 2017 bankruptcy filing.  On August 29, 2017, Brown's counsel obtained $33,709.61 from that escrow and subsequently distributed to Brown $16,854.80, representing half that amount.  The latter figure exceeds $15,364.21, which is the only credible computation for post-Amended Judgment commissions owed Brown.  Accordingly, Brown has been fully compensated for any damages accruing by virtue of the Amended Judgment's prospective commission language.

2.  Specific Damages Accruing in the Debtors' 2014 and 2017 Bankruptcy Cases and Bracketing the Amended Judgment

Brown, however, also seeks damages based on his state law causes of action for damages that predate and postdate the Amended Judgment.  Specifically, Brown alleges that the debtors in their 2014 bankruptcy case "unlawfully received commissions owed to [Brown] and [did] not disclose receipt of such funds to the Chapter 13 Trustee or this Court in that bankruptcy case in the approximate amount of $112,000.00."  (Compl. at ¶ 10.)  Further, Brown alleges that "[u]pon information and belief, the [d]ebtors have received in excess of $121,000.00 in commissions checks in 2017 and an untold amount in 2018."  (Compl. at ¶ 22.)  Additionally, "[u]pon information and belief, out of the funds received through 2017, it is believed that the [d]ebtors have taken and hidden approximately $96,000.00 in cash from those proceeds.  One-third of these funds represent [Brown's] commissions."  (Compl. at ¶ 23.)

Ignoring arguendo that some unspecified amount of these alleged damages predate and are presumably subsumed into the June 2017 Amended Judgment, the record is bereft of any evidence supporting these allegations.  They are wholly unproven as relates to the 2014 case, the 2017 case, the year 2018, or thereafter.

3.   Commissions Brown Believes Are Owed Him Based on VP Products Still Sold in Walmart Stores

In his Complaint, Brown disputes that the Sales Representation Agreement between VP and the debtors was "properly terminated," which forms one basis for Brown's apparent belief that he is still entitled to commissions because Walmart continues to sell VP products.  (Compl. at ¶¶ 28, 29.)  Brown's second basis for this belief is the future commissions language contained in the Amended Judgment.  Several considerations factually and legally compel the opposite conclusion.

First, the proof is that the debtors discussed and terminated MSG's contract with VP effective August 31, 2017.  Nothing in the record suggests an ineffective or improper termination.  As discussed above, the escrow account ordered in the debtors' 2014 bankruptcy case fully bracketed the May verdict, the June Amended Judgment, the August termination, and the debtors' September 2017 bankruptcy filing.  Those funds are fully accounted for, and Brown's attorney obtained them in August 2017.

Second, the debtors did business as a sole proprietorship.  Any asset of MSG became property of the estate on September 6, 2017, when the debtors filed their second bankruptcy case.  11 U.S.C. § 541.  Upon conversion, it became the duty of the chapter 7 trustee under 11 U.S.C. § 704 to take responsibility for those assets and administer same.  Every indication is that the trustee did exactly that.  The trustee's Final Report discloses that he took possession of $11,923.41 representing post-petition account receivables from VP, a number consistent with the last two checks that VP's records reflect were sent to MSG.  Mrs. Rouse credibly testified that these two checks were received post-petition and properly turned over to the trustee as property of the estate.

Third, the trustee's Final Report shows an additional $50,000 received by the estate because of a cause of action initiated by the trustee against VP and from which Brown received a distribution.  Other than the Final Report, neither party introduced any expositive evidence as to

25

the exact nature of this litigation and its resolution.  The court can only conclude that the trustee pursued VP based upon the debtors'/MSG's interest in future commissions and obtained a resolution in which Brown participated.  The chapter 7 trustee had a legal duty to administer this asset, and nothing in this record suggests that he did anything other than that.  There has been no objection interposed or defect suggested as to its resolution and distribution of proceeds.

Fourth, VP is not a party to this adversary proceeding.  This court lacks jurisdiction to order it to pay Brown anything.

To summarize, Brown's June 2017 Amended Judgment compensated him for proven damages up to that date.  The VP receivables from May 2017 through October 2017 are fully accounted for from either deposits into the court-ordered escrow account which Brown's attorney collected right before the 2017 bankruptcy or, post-bankruptcy, those sums being directed to the chapter 7 trustee.  The trustee inherited any further or future claims against VP, which duty occasioned litigation he initiated and settled.  All is accounted for, and there is no proof of any additional damages owed Brown.  Regardless of whether Brown's additional damage claims arise from the specific language of the Amended Judgment, are derivative of the Amended Judgment, predate the Amended Judgment and arguably subsumed in the Amended Judgment, or represent independent causes of action, Brown has proved no additional damages and any award is unwarranted.

### B.  Judgment Outstanding

Typically, in a case involving dischargeability where there is a previous judgment, the issue of satisfaction does not arise.  In this instance, two circumstances occasion review.

First, the Amended Judgment called for post-judgment damages for which Brown has requested judgment. As discussed above, Brown proved no additional damages for which he has not been compensated.

Second, the debtors have asserted that Brown's dischargeability causes of action are inappropriate given that the Amended Judgment has been satisfied in full. The Amended Judgment award of $57,570.56, plus $15,364.21 in post-Amended Judgment damages, totals $72,934.77. The following credits are appropriate:

$16,854.80

$5,000.00

$3,067.26

$4,621.59

$1,589.78

$3,974.47

This results in a total Amended Judgment balance of $37,826.87. The Amended Judgment remains unsatisfied, but no further damages lie.

## C.  Dischargeability

Brown seeks to deny discharge of the Amended Judgment on two bases, each of which are discussed below.

### 1.  Fraud or Defalcation While Acting in a Fiduciary Capacity, Embezzlement, or Larceny

Individual debtors may be denied discharge of a particular debt on grounds enumerated in 11 U.S.C. § 523, inclusive of debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." At trial, Brown abandoned his claim based on a fiduciary relationship, thus confining this analysis to embezzlement or larceny. Specifically, Brown alleges as follows:

27

59. Debtors engaged in a course of deceptive conduct intended to thwart [Brown's] right to his commissions as described herein.

60. Debtors intended to deceive [Brown] and to deprive him of his commissions from VP . . . .

61. The [d]ebtors have embezzled funds that were in their care but that were owed to [Brown].

62. The [d]ebtors have stolen [Brown's] commissions. . . .

64. Debtors are not entitled to discharge the indebtedness owed to [Brown] pursuant to 11 U.S.C. § 523(a)(4).

(Compl. at ¶¶ 59-62, 64.)

As discussed above, Brown did not prove any damages other than the specific damages set forth in the Amended Judgment. To the extent the future commission clause in the Amended Judgment is facially open-ended, that uncertainty has been conclusively capped at $15,364.21. The escrowed funds alone have fully compensated Brown for the latter amount. The former has been reduced, but not completely paid, and represents a jury verdict solely for breach of contract. There is no jury verdict or judgment in the state court litigation for either embezzlement or larceny.

This, however, does not conclusively resolve the issue. Specifically, judgments in other courts are not necessarily res judicata in subsequent bankruptcy proceedings concerning dischargeability. Dischargeability actions are unique to bankruptcy and arise only at the filing of the debtors' petition. As stated in this court's prior order denying the debtors' request for summary judgment:

> Expressly, "[t]he United States Supreme Court in *Brown v. Felsen* determined res judicata does not apply in nondischargeability proceedings." *Pulvermacher v. Pulvermacher (In re Pulvermacher)*, 567 B.R. 881, 886 (Bankr. W.D. Wis. 2017) citing *Brown v. Felsen*, 442 U.S. 127, 138–39 (1979); *see also Thomas v. Pine Creek II Apartments, Ltd. (In re Pine Creek II Apartments, Ltd.)*, 182 B.R. 36, 37 (Bankr. W.D. Ark. 1995) ("*Brown's* rationale was that it was solely for the bankruptcy court to determine the dischargeability of debts; such matters of federal law could not be determined by the state courts such that res judicata could not be

28

applied to preclude relitigation of issues in dischargeability proceedings."). "Since *Brown*, 'there is a general rule that state court judgments do not have res judicata effect on nondischargeability actions under § 523.'" *Pulvermacher*, 567 B.R. at 886 (citations omitted).

Section 523(a) of the Bankruptcy Code enumerates several alternative bases to deny the dischargeability of a debt to a specific creditor. Although many of these grounds sound in contract or tort—typical state law causes of actions—they are not causes of action for the purpose of establishing a debt or damages. The purpose of each is to determine if the debt or damages are nondischargeable. The obvious and apparent reason that so many of the nondischargeability causes of action mirror state or federal causes of action such as fraud, embezzlement, misrepresentation, and the like, is that those causes of action that do establish a debt or damages are of the type or nature that Congress wished to deny dischargeability. But, the grounds for nondischargeability are discrete and not necessarily the same causes of action as those for establishing the underlying debt or damages. Accordingly, res judicata is generally not the appropriate basis for determining the conclusive nature of the prior judgment in another court.

*Brown v. Rouse* (*In re Rouse*), Ch. 7 Case No. 5:17-bk-72254, Adv. No. 5:18-ap-07075, at *3-4 (Bankr. W.D. Ark. Dec. 30, 2021), ECF No. 88 [hereinafter *Brown Summary Judgment Order*]. Accordingly, the breach of contract cause of action forming the basis of the Amended Judgment is not conclusive as respects dischargeability, and the debtors conduct is reviewable based upon the elements of the unique causes of action enumerated in 11 U.S.C. § 523 concerning dischargeability.

Larceny is theft, defined more exactly as "the 'wrongful taking and carrying away of the property of another with the intent to convert such property to the taker's use without the consent of the owner.' The exception [to discharge] does not apply if the debtor's original possession of the property is lawful." *In re Thompson*, 458 B.R. 504, 510 (B.A.P. 8th Cir. 2011) (first quoting *Kan. Bankers Sur. Co. v. Eggleston (In re Eggleston)*, 243 B.R. 365, 378 (Bankr. W.D. Mo. 2000); and then citing *Werner v. Hofmann*, 5 F.3d 1170, 1172 (8th Cir. 1993)).

Here, there is no question but that the debtors d/b/a MSG properly possessed any and all commissions originating from VP per their contractual relationship. Brown enjoyed no contractual

29

relationship with VP.  Brown's right to share in commissions was the subject of a separate contract with the debtors d/b/a MSG, from whence arose a bona fide dispute between the parties ultimately resolved in Brown's favor.  There is no evidence that this dispute was anything other than a legitimate disagreement between two parties to a contract.  There is no evidence that there were any other amounts due and owing that are not encompassed within the Amended Judgment, including prospective damages.  The record fully accounts for all of Brown's damages with no indication of theft.  Any breach of contract action contemplates that at some point a verdict will determine that one party owes the other; that verdict does not contemplate the immediate onus of theft absent additional facts not present on this record.

The same applies to embezzlement.  The court in *Thompson* defines "embezzlement [as] the 'fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come.'"  *Id.* at 510 (quoting *Belfry v. Cardozo (In re Belfry)*, 862 F.2d 661, 662 (8th Cir. 1988)).  "To prevail, the creditor must establish 'the debtor improperly used the creditor's property before complying with some obligation to the creditor.'"  *Id.* (quoting *Hofmann*, 5 F.3d at 1172).

Again, the debtors d/b/a MSG contracted with VP and had first and original rights in the commissions, subject only to a separate contractual obligation to Brown.  That contractual obligation became the genesis of a legitimate dispute between the parties ultimately resolved in the state court lawsuit.  Brown did not entrust his commissions to the debtors.  The debtors enjoyed the contractual relationship with VP; VP's payments to the debtors fully relieved it of any contractual burden to any other party, including Brown.  The debtors in turn may have had a contractual obligation to pay Brown, but that obligation was contractual and not because of Brown

entrusting his property to the debtors subject to their embezzlement.  The record simply reflects a bona fide contractual dispute between two contracting parties.

2.   Willful and Malicious Injury

Brown seeks to deny the debtors their discharge based on a "willful and malicious injury by the debtor[s] to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  Specifically, Brown alleges:

> 65. Debtors are likewise not entitled to discharge the indebtedness owed to [Brown] pursuant to 11 U.S.C. § 523(a)(6).  Debtors have engaged in wilful and malicious conduct specifically targeted at [Brown] to deprive him of his due income from commissions.

> 66. Debtors' purposeful conduct was headstrong and knowing, and was specifically targeted at [Brown] in a manner certain to cause harm, which proximately caused damages to [Brown].   Debtors' wilful and malicious conduct renders the indebtedness non-dischargeable under 11 U.S.C. § 523(a)(6)."

(Compl. at ¶¶ 65-66.)

As discussed above, the only damages remaining are those subsumed into the specific award contained in the Amended Judgment.  The Complaint as originally drafted contemplated that there would be substantial unknown damages based on stolen commissions.  However, that circumstance did not present, and the entirety of Brown's claim is as reflected in the Amended Judgment, now reduced by execution, the escrow, and distributions from the chapter 7 trustee.

Again, the sole basis stated for the Amended Judgment award is breach of contract.  Equally, and as discussed above, this does not prevent an independent inquiry into whether the debt is dischargeable in bankruptcy.  Brown properly argued in closing a recent Eighth Circuit Court of Appeals decision also referenced in this court's prior order concerning summary judgment, to wit:

In *Luebbert v. Global Control Systems*, the Eighth Circuit Court of Appeals considered a nondischargeability action based on a willful and malicious injury regarding a state court breach of contract judgment. *Luebbert v. Glob. Control Sys.*, 987 F.3d 771, 776 (8th Cir. 2021). In doing so, the court held that "a judgment for an intentional tort is not necessary to find judgment debt for a breach of contract nondischargeable. The willfulness requirement is met when the bankruptcy court finds facts showing that the debtor's conduct accompanying the breach of contract amounted to an intentional tort against the creditor." *Id.* at 782. Further, "[e]ven if a judgment debt is for breach of contract, bankruptcy courts are not required to blind themselves to a willful and malicious injury inflicted on the judgment creditor." *Id.* at 783. "The mere fact that recovery for wrongful conduct was based in contract and not in tort—despite being possible in both under the same set of facts—does not prevent the resulting judgment debt from being exempt from discharge under § 523(a)(6)." *Id.* at 783–84. Thus, a judgment does not have to "sound in tort." *Id.* at 784. Rather, "[i]t is enough to show that the conduct amounting to an intentional tort accompanied the breach of contract for a creditor to meet the willful injury requirement of § 523(a)(6)." *Id.* at 783.

Thus, this matter may be tried and examined based on the now available dischargeability causes of action.

*Brown Summary Judgment Order*, at *4-5, ECF No. 88.

The court in *Luebbert* agreed with the bankruptcy court in "conclud[ing] the facts underlying Mr. Luebbert's breach of contract judgment show that he caused a willful and malicious injury." *In re Luebbert*, 987 F.3d at 776. Thus, further inquiry is warranted.

The facts and circumstances in *Luebbert*, however, are distinguishable from the present case. Although Mr. Luebbert had indeed breached his contract, the facts there indicated that he was one of the worst contract breachers imaginable. Mr. Luebbert was a schemer, a liar, a serial breacher, and an artificer who "took calculated and clandestine steps to do business with [his employer's customer] in violation of his obligations. Pointing to Missouri law on conversion and breach of fiduciary duty, the bankruptcy court found that Luebbert's conduct 'echoes of conversion or some other tort.'" *Id.* at 778.

The facts in the present case demonstrate nothing more than what is stated in the Amended Judgment—an award for simple breach of contract. The testimony here reflects that the debtors

had valid and bona fide bases for believing Brown to be in breach of contract.  In fact, the debtors initiated the state court lawsuit and lost solely on a breach of contract cause of action when Brown counterclaimed.  There is no larceny, embezzlement, or conversion of another's property.  The debtors received VP commissions per their contractual relationship, and a legitimate dispute arose as to Brown's share based on a separate contract between the debtors and Brown.  The state court litigation resolved the contractual dispute in Brown's favor.  Brown presented no evidence in the trial of this adversary proceeding sounding in tort or any traditional elements of a willful and malicious injury standard sufficient to deny dischargeability of the indebtedness owed.

### D.  Discharge

Brown also seeks to deny the debtors their entire discharge on four grounds set forth in 11 U.S.C. § 727.  The evidence does not support this effort.

#### 1.  11 U.S.C. § 727(a)(2)

Brown alleges as follows:

53. In addition, [d]ebtors have concealed and failed to schedule all of their assets with the intent to hinder, delay, or defraud.  The undisputed evidence confirms that [d]ebtors has received more than $112,000.00 in 2017, but they cannot account for any of it.  Upon information and belief, the [d]ebtors have been paid additional funds without disclosing the amounts in their bankruptcy schedules.  Therefore, [d]ebtors is barred from a discharge under 11 U.S.C. § 727 (a)(2).

(Compl. at ¶ 53.)

11 U.S.C. § 727(a)(2) provides that a debtor may lose his or her discharge if:

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

To prevail, Brown had to demonstrate by a preponderance of the evidence:

(1) that the act complained of was done within one year prior to the date of petition filing; (2) the act was that of the debtor; (3) it consisted of a transfer, removal, destruction or concealment of the debtor's property; and (4) it was done with an intent to hinder, delay, or defraud either a creditor or an officer of the estate.

*In re Arnold*, 652 B.R. 883, 901 (Bankr. E.D. Ark. 2023) (citing *In re Korte*, 262 B.R. 464, 472 (B.A.P. 8th Cir. 2001)).

As pled, Brown had specific concerns about approximately $112,000 in 2017 and more general concerns involving additional unspecified funds, each presumably undisclosed on the debtors' schedules. Brown, however, has not proven any amount either specifically or generally. As previously stated, the evidence on this record fully accounts for any post-Amended Judgment commissions, and there is no evidence of additional paid or unaccounted for commissions in 2014, 2017, or otherwise.[7]

### 2. 11 U.S.C. § 727(a)(3)

Brown alleges as follows: "The [d]ebtors have also failed to keep sufficient records from which the aforementioned assets, business transactions and financial condition might be ascertained within the meaning of 11 U.S.C. § 727 (a)(3). Debtors are barred from receiving a discharge on this basis." (Compl. at ¶ 54.)

11 U.S.C. § 727(a)(3) provides that a debtor may not earn a discharge if:

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

---

[7] At trial Brown raised issues about other assets that he contends are unaccounted for on the debtors' schedules. Most of these overlap with the discussion regarding 727(a)(4) false oaths or accounts. To avoid redundancy, these other concerns are addressed below.

The court in *In re Dykes* lays out the analysis as follows:

> To present a prima facie case under § 727(a)(3), the objecting party (here, the Trustee) must show "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." *Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir. 1992). The test is "whether there is available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained." *Id.* at 1230 (quotation omitted). "The debtor is required to take such steps as ordinary fair dealing and common caution dictate to enable the creditors to learn what he did with his estate." *In re Wolfe*, 232 B.R. 741, 745 (8th Cir. B.A.P. 1999) (quotation omitted). If the Trustee meets that initial burden, "the burden of production shifts to the debtor to offer a justification for his record keeping (or lack thereof); however, the objecting party bears the ultimate burden of proof with respect to all elements of this claim." *In re Swanson*, 476 B.R. [236,] 240 [(B.A.P. 8th Cir. 2012)]. These are questions of fact. Section 727(a)(3) embodies an objective standard of reasonableness; it does not require proof of intent. *In re Wolfe*, 232 B.R. at 745.

*In re Dykes*, 954 F.3d 1157, 1163 (8th Cir. 2020).

Again, the proof does not support these allegations. Brown's principal concern related to VP commissions paid to the debtors d/b/a MSG. To that end, Brown presented documentation from VP showing all the commissions it paid MSG. All are accounted for. At no time did Brown point out that this information was incorrect or that there were unpaid commissions owed Brown other than as reflected by the Amended Judgment. The debtors and the record fully account for any commissions accruing thereafter. There is simply no evidence that the debtors concealed, destroyed, mutilated, falsified, or failed to maintain records to obfuscate their business dealings before or after filing their present bankruptcy case.

### 3.   11 U.S.C. § 727(a)(4)(A)

Brown alleges as follows: "Debtors are not entitled to a discharge. Debtors have knowingly and fraudulently made a false oath or account within the meaning of 11 U.S.C. § 727 (a)(4)(A).

Debtors have provided false information in connection with the case and are therefore barred from receiving a discharge."  (Compl. at ¶ 52.)

11 U.S.C. § 727(a)(4)(A) provides that individual debtors may lose their discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."

The court in *Grimlie* suggests the analysis:

> Similarly, as to § 727(a)(4), the Bankruptcy Court correctly stated that, "[i]n order to deny a debtor a discharge under this subparagraph, a plaintiff must establish that: (1) the debtor knowingly and fraudulently; (2) in or in connection with the case; (3) made a false oath or account; (4) regarding a material matter."  Under § 727(a)(4)(A), a false statement may bar discharge if it is both material and made with intent.  Intent can be established by circumstantial evidence and statements made with reckless indifference to the truth are regarded as intentionally false.  If a false oath bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property, it is material.

*In re Grimlie*, 439 B.R. 710, 717 (B.A.P. 8th Cir. 2010) (quotations omitted).

Contextually, Brown's Complaint appears principally directed to the debtors' alleged failure to list and disclose VP commissions which he believes were partially his.  As discussed above, the commissions are all accounted for and were either subsumed pre-judgment into the Amended Judgment or paid post Amended Judgment.

At trial, however, Brown expanded his attack on the debtors' schedules.  These additional areas are addressed in turn below.  Each, however, exhibits the same characteristics.  While certainly Brown elicited some inconsistencies, and inconsistencies can be some evidence of fraudulent intent, sometimes inconsistencies are simply that—the product of snapshots in time involving estimates, approximations, differences in opinion, and mistakes made at a time of economic distress.  Equally, blaming counsel is not an excuse and is not countenanced as such. Parties are responsible for their schedules, and the debtors are responsible for theirs; the proof

36

regarding their schedules does not, however, sufficiently rise to the level of a false oath or account made with fraudulent intent concerning material matters.

### a. Home

Brown questions the accuracy of the debtors' schedules as to where they lived and the sale of their home for $222,000 versus a scheduled valuation of $180,500. The debtors adequately explained both.

When the debtors filed their petition on September 6, 2017, they listed "[w]here you live" as 3463 Paris Lane in Springdale, Arkansas. (Pls.' Ex. 1, at 2.) When the debtors filed their October 20, 2017, schedules, they exempted part and indicated that they ceased living there in October 2017. (Pls.' Ex. 2, at 11, 53.) Mrs. Rouse testified that they moved to Texas in "Octoberish" of 2017. All of this signifies nothing more than that the debtors owned the Paris Lane property, lived there when they filed their petition, properly claimed it as exempt, and thereafter moved. None of this is false or otherwise offensive.

As to value, the debtors valued their home when they filed at $180,500. (Pls.' Ex. 1, at 2; Pls.' Ex. 2, at 3.) They echoed that value when they amended their schedules in June 2018. (Pls.' Ex. 3, at 1.) The chapter 7 trustee included in his Final Report that he sold the home for $222,000. (Pls.' Ex. 10, at 3.)

Mrs. Rouse testified she got their value from a realtor assessment and it was valued "as is" because of flood damage. The home suffered lightning and water damage in August 2017, right before the debtors filed their 2017 bankruptcy. Mrs. Rouse indicated they had made some repairs prior to the sale. Nothing in this narrative suggests anything other than the debtors' unprofessional valuation of their own damaged home and a trustee later selling the property for more. Brown did not meet his burden of proof as to intent, fraud, or otherwise.

b.  Vehicles

Brown focused on the debtors' vehicles.  The debtors listed ownership of a Nissan Altima and a Nissan Rogue in their schedules.  (Pls.' Ex. 2, at 4.)  The debtors exempted both vehicles. (Pls.' Ex. 2, at 11.)  On their amended schedules filed June 1, 2018, the Rouge remained but not the Altima.  (Pls.' Ex. 3, at 2.)  The debtors offered no explanation for the Altima's disappearance, but exemption renders this irrelevant.  The car belonged to them, not the estate. Brown did not meet his burden of proof with respect to the vehicles.

c.  Household Goods, Furnishings, and Electronics

On their October 20, 2017, schedules, the debtors listed various household goods and furnishings valued at $2,046, plus other miscellaneous items, totaling a combined value of $6,421. (Pls.' Ex. 2, at 5-6, 10.)  They assigned an additional $250 in miscellaneous value to a lawnmower, garden tools, grill, and patio furniture, plus $2,250 for business related property.  (Pls.' Ex. 2, at 10.)

Brown attacked the debtors' schedules with respect to their personal property. Several factors contributed to the inexactness of this issue.  They include: some personal property was lost or damaged due to lightning and water in August 2017; the debtors lost the state court litigation in May 2017 and Brown caused the Washington County Sheriff's Department to start executing on their personal property; the debtors stored assorted but unspecified personal property in storage units; and, the debtors filed their 2017 bankruptcy in September and then started moving to Katy, Texas around the same time.

Specifically, the debtors scheduled a lightning and water loss on August 24, 2017, of "[v]arious personal property" valued at approximately $20,000.  (Pls.' Ex. 2, at 56.)   They disclosed on their schedules that the Washington County Sheriff's Department had executed on

their personal property. (Pls.' Ex. 2, at 58.) Additionally, without specifying a value—which is not called for by the question—the debtors disclosed on their schedules that they had property in a storage unit at Airtight Self-Storage which they described as "[a]ll household property." (Pls.' Ex. 2, at 58.) The debtors also disclosed that they had "[p]ersonal [p]roperty" stored at CubeSmart. (Pls.' Ex. 2, at 58.) The miscellaneous household goods and furnishings value increased to $8,000 on their amended June 1, 2018, schedules based the Webster Valuation List, a third-party valuation of the personal property located in storage units. (Pls.' Ex. 3, at 2, 7-8.) There is also attached a listing which represents items executed on by the Washington County Sheriff's Department, as referenced in the debtors' schedules. (Pls.' Ex. 3, at 11-21.) This is amplified below.

The combination of all these factors resulted in a lack of clarity and exactness which carried over to the chapter 7 trustee's administration of the estate and is reflected in his Final Report. Specifically, the trustee's Final Report contains this entry:

> Undisclosed Household Goods and Furnishings[.] Debtors did not list all of their personal property on original schedules, although there is some overlap but difficult to tell based on varying descriptions. Debtors moved all personal property to TX. Trustee reached compromise for them to lower their exemptions in house in exchange for non-exempt equity in undisclosed personal property. Motion to compromise DN156 and Order granting DN170. . . . Except as to any duplication, this entry of undisclosed personal property includes: Exhibit B to DN156- Webster Valuation List which includes Exhibit A property on WCSO Inventory List; stove, refrigerator, freezer, washer, dryer, microwave, dishwasher, 2 couches, entertainment center, 3 chairs, kitchen table w/4 chairs, 1 dining table w/4 chairs, 4 DVD players, gaming system, 5 coffee tables, 2 book shelves, 2 dressers, 3 night stands, 19"TV, 32" TV, 45" TV, 48" TV, 50"TV, king size bed, queen size bed, outdoor patio set, dyson vacumn cleaner. - Less $2046.00 valuation of items disclosed on original schedules.

(Pls.' Ex. 10, at 11-12.)

The chapter 7 trustee apparently reconciled all these uncertainties regarding the debtors' personal property through the sale of the debtors' now empty home by offsetting their homestead exemption. Although the trustee uses the term "undisclosed," there is no indication that the debtors

39

were actively trying to hide any of their personal property.  They disclosed the writ of execution, the lightning and water damage, and the fact that they had storage units and where they were located.  The chapter 7 trustee did not testify at trial, but other than that reference there is no evidence to indicate that the difficulty was in finding all the assets; rather, the difficulty was reconciling and valuing what assets were located where and by whom held, including the garnished personalty.  It appears that the trustee engaged in a normal and typical chapter 7 liquidating process in balancing and counterbalancing the exempt home equity to reach an appropriate resolution that rendered clarity to the uncertain state of the debtors' personal property.  Brown introduced no evidence of any active effort to hide assets such as might render the schedules intentionally false.

d.  Cash

Brown also focused on conflicting cash-on-hand numbers.  Initially, the debtors listed cash in their possession as of the date of their petition, September 6, 2017, as $20.  (Pls.' Ex. 2, at 6.) Confusingly, this $20 amount increased on the debtors' June 1, 2018, amended schedules to $65,825 "on hand when you file[d] your petition," that is, September 6, 2017.  (Pls.' Ex. 3, at 3.) That significant change is constrained, however by dates other than the petition date; specifically, an added notation states: "Cash $25,000 in 03/2017, $16,000 in 04/2017, $24,825 in 05/2017." (Pls.' Ex. 3, at 3.)  All three predate the debtors' 2017 bankruptcy filing and typically would not be relevant to cash-on-hand on the petition date.  Although Mrs. Rouse had difficulty recalling why they amended their schedules in this manner, the trustee's Final Report sheds some light on the issue.  In his Final Report, the trustee specifically references the amended figure of $65,825 and states:

> Undisclosed Cash[.] Debtors filed amended schedules that disclosed this asset on Sched C at DN188.  Debtors re-amended DN 207 to delete because they claim to have amended in error--they did not have this money at the time of filing, but listed it as an asset because creditors claimed there is this amount of money unaccounted

40

for that they should have, but the debtors claim they did not have at the time of filing.

(Pls.' Ex. 10, at 12.)  Mrs. Rouse agreed with this narrative when it was presented to her during examination by Brown's counsel.  Brown did not produce evidence that the debtors had that much cash on the dates mentioned, on the date they filed their petition, or that cash had disappeared as part of some scheme to defraud.  The only evidence is that the debtors had no cash when they filed. The debtors amended to reflect figures creditors thought they had but they claimed they did not. Brown did not prove otherwise.

### e.   Deposits

Brown focused on the debtors' checking accounts, presumably on the idea that they may have underreported balances or inappropriately moved money.  Mrs. Rouse testified that between them personally and MSG they had three banking relationships in 2017: Bank of America, Legacy Bank, and Arvest Bank.  The debtors indicated that they closed three checking accounts in the year prior to their bankruptcy filing: two at Bank of America and one at Legacy Bank.  They reported the last balance at closing for each was $0.  They did not disclose the dates the accounts were closed.  (Pls.' Ex. 2, at 57-58.)

The debtors listed one "[c]hecking, savings, or other financial account[]" on their initial schedules: "Arvest Bank account ending in 9048" with a balance of $5.  (Pls.' Ex. 2, at 6.)  The debtors exempted this balance.  (Pls.' Ex. 2, at 12.)  Mrs. Rouse testified that they had no other banking accounts in October 2017.  When the debtors amended their schedules on June 1, 2018, they indicated they had no checking, savings, or other financial accounts.  (Pls.' Ex. 3, at 4.)

Brown did not introduce or elicit any evidence that would reflect that the above information is false.

f.   Income

Brown focused on the debtors' income.  For the period from January 1, 2017, to September 6, 2017, Mr. Rouse reported income of $128,677.54 and Mrs. Rouse income of $126,007.75.  (Pls.' Ex. 2, at 54.)  As of October 20, 2017, approximately a month and a half after their September 6 filing, the debtors listed their income as a combined $3,782 a month with expenses of $1,545 a month.  (Pls.' Ex. 2, at 1, 49, 51.)  At filing, Mr. Rouse represented that for the last five years he was self-employed in consulting.  Mrs. Rouse is listed as unemployed.  His monthly "gross wages, salary, and commissions" are $1,650 a month plus SNAP benefits of $164 a month; her's is listed as $1,804 a month plus SNAP benefits of $164 a month, for a combined income of $3,782.  (Pls.' Ex. 2, at 48-49.)  No payroll deductions are scheduled, and unclear is the incongruity between her monthly income and her unemployed status.  (Pls.' Ex. 2, at 48-49.)  The only increase or decrease that the debtors listed as expected within the year after filing is that the SNAP benefits would increase to $352 in November and December 2017.  (Pls.' Ex. 2, at 49.)  At trial, Mr. Rouse testified that he no longer works and is on Social Security.

Brown introduced a number of bank statements but, without context or a forensic review, it is difficult to determine what exact information might be gleaned from the various checking account statements that might be pertinent to this proceeding.  (Pls.' Ex. 8; Pls.' Ex. 8a.)  Compounding this is the lack of any testimony or evidence that would reduce gross numbers to net numbers, which is particularly problematic when dealing with a sole proprietorship.  This lack of clarity includes intimations of VP receivables coming in with no regard to the money going into the escrow account or to pay other commissions.  There simply is not enough information to understand these figures or see where they reflect false oaths or accounts in the schedules.  Brown failed to meet his burden in this regard.

g.   Statement of Income and Commitment Period

The debtors filed a chapter 13 reorganization on September 6, 2017.  Accordingly, the debtors completed Official Form 122C-1, the Chapter 13 Statement of Your Current Monthly Income and Calculation of Commitment Period, designed to elicit their applicable commitment period.  Their entries reflected an income below the median income in Arkansas, thus initiating a three-year commitment period without having to determine their disposable income under 11 U.S.C. § 1325(b)(3).  (Pls.' Ex. 2, at 61.)  Specifically, the debtors mirrored their respective incomes of $1,650 and $1,804 a month for a collective monthly income of $3,454 and an annualized income of $41,448.  That figure was below the median income for a family of two in Arkansas of $48,602.  (Pls.' Ex. 2, at 61-63.)

Brown successfully challenged the debtors' calculations and proved they used an incorrect income figure.  Specifically, in determining their "average monthly income that [they] received from all sources, derived during the 6 full months before [they filed] this bankruptcy case," the debtors were required to report their *average* income for the six months prior to filing.  (Pls.' Ex. 2, at 61-63.)  The debtors filed their case on September 6, 2017, making March to August the appropriate time frame.  The debtors' schedules also reported that inclusive of that time frame, from January 1 to the date of filing, Mr. Rouse earned from wages, commissions, bonuses, or tips $128,677.54 and Mrs. Rouse $126,007.75.  (Pls.' Ex. 2, at 54.)  Although their income varied based upon commissions, dividing Mr. Rouse's 2017 income by eight months reflects an estimated monthly income of $16,084.69 a month, while the same formula applied to Mrs. Rouse's income reflects a figure of $15,750.97 a month, both far above their reported average over the preceding six-month period.  The debtors could offer no explanation for this discrepancy other than blaming advice of counsel.

43

Mrs. Rouse testified that she indicated on her schedules she was not employed because her employment with the Dial Corporation ceased when, after the Amended Judgment, their personal property was garnished in August 2017. She indicated that she received severance pay in September 2017. Gainsay, both months were in the six-month period prior to their September 6, 2017, filing. Mrs. Rouse had no real explanation for listing $1,804 as her Schedule I income other than to again blame her attorney.

Obviously, the debtors' income calculation is not correct for purposes of determining their applicable commitment period. This does not mean, however, that this calculation constitutes a false oath or account.

This calculation is part of the changes effected in the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005). Under the statutory scheme, individual consumer debtors who file chapter 7 are subjected first to a calculation of whether their income is above or below the median income and, if above, then a means test calculation which can raise a presumption of abuse. If the presumption arises, the chapter 7 case can on motion be dismissed or, with the debtor's consent, voluntarily converted to a chapter 13. Similar calculations present in a chapter 13 case to first determine the applicable commitment period based on whether the debtor is above or below median income. If above median income, the rubric calls for the application of an expense formula like the means test to determine the debtor's projected disposable income available for unsecured creditors.

Here, the debtors filed a chapter 13 reorganization in the first instance. This is not the circumstance where a debtor files a chapter 7 and deliberately misrepresents his or her income to avoid dismissal or conversion to a chapter 13. The incentive to mislead creditors as to income is

significantly diminished when a debtor originally files a chapter 13 rather than a chapter 7 and voluntarily submits himself or herself to the plan reorganization process.

This plan process contemplates the debtor's income as half of the equation in determining a debtor's projected disposable income to pay pre-petition unsecured debt. Here, the debtors filed their chapter 13 case, which presumably would have been followed by them routinely proposing a plan committing their projected disposable income. Creditors could then object to the plan and question the debtors' income calculation, the commensurate applicable commitment period, and their resulting projected disposable income. Any creditor, including Brown, could have objected and maximized his and the other creditors' distribution as the proof allowed. Conversion to a chapter 7 mooted that potential and, while the record is not entirely clear on this point, some testimony suggested that Brown participated in the effort to convert these debtors to a chapter 7 liquidation.

Further, debtors are entitled to interpose a lesser income figure for plan purposes than the number suggested by the six-month average calculation. While it does not excuse the debtors from improperly calculating their pre-petition average income, the Supreme Court of the United States has recognized that chapter 13 debtors may propose a plan figure less than the six-month calculation. In *Hamilton v. Lanning*, the Court faced a similar situation where the six-month calculation was based on income no longer available to the debtor and stated:

> In cases in which a debtor's disposable income during the 6-month lookback period is either substantially lower or higher than the debtor's disposable income during the plan period, the mechanical approach would produce senseless results that we do not think Congress intended. In cases in which the debtor's disposable income is higher during the plan period, the mechanical approach would deny creditors payments that the debtor could easily make. And where, as in the present case, the debtor's disposable income during the plan period is substantially lower, the mechanical approach would deny the protection of Chapter 13 to debtors who meet the chapter's main eligibility requirements. Here, for example, respondent is an "individual whose income is sufficiently stable and regular" to allow her "to make

45

> payments under a plan," [11 U.S.C.] § 101(30), and her debts fall below the limits set out in [11 U.S.C.] § 109(e).  But if the mechanical approach were used, she could not file a confirmable plan.  Under 11 U.S.C. § 1325(a)(6), a plan cannot be confirmed unless "the debtor will be able to make all payments under the plan and to comply with the plan."  And as petitioner concedes, respondent could not possibly make the payments that the mechanical approach prescribes.

*Hamilton v. Lanning*, 560 U.S. 505, 520-21 (2010).

Here, the record adequately demonstrates that the six-month calculation was not an accurate indication of the debtors' actual income in September 2017 and presumably at plan confirmation.  The aggregate circumstances, including the loss of the state court litigation, the escrow of commissions thereafter, termination of Mrs. Rouse's employment, garnishments and execution of assets, and the end of the contractual relationship with VP, would justify the debtors proposing a plan payment more in line with their actual income.  Again, this does not excuse their miscalculation; rather, Brown or any other creditor would have been afforded the opportunity to object to a plan in the debtors' original chapter 13 case based on these calculations, and the debtors would have had an equal opportunity to argue the appropriateness of a lesser and more realistic amount.  Conversion to a chapter 7 liquidation mooted all this.

Additionally, the evidence Brown used to question the income calculation came exclusively from information fully disclosed in the debtors' schedules.  Brown did not use any extrinsic evidence to prove that in the aggregate the debtors were misrepresenting their income.  In fact, the debtors specifically and fully disclosed their year-to-date incomes.  All the impeachment evidence Brown needed came from information the debtors fully disclosed on the very same schedules he questions.

While the record is not entirely clear as to the cause of this miscalculation, be it a mistake or indifference to instructions, what is clear is that there is insufficient evidence in this record to prove it was a deliberate effort to defraud creditors, particularly on a question rendered irrelevant

and immaterial after a conversion from chapter 13 to chapter 7. Brown did not carry his burden of proof on this issue.

### 4.   11 U.S.C. § 727(a)(5)

Brown alleges in his Complaint: "The [d]ebtors are also not entitled to a discharge under 11 U.S.C. § 727 (a)(5) as they have failed to satisfactorily explain the loss of assets purchased from funds received by VP Racing and cash received from VP Racing. Debtors are barred from receiving a discharge on this basis." (Compl. at ¶ 55.)

A debtor may lose his discharge if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). "The party objecting to a debtor's discharge pursuant to section 727(a)(5) has the burden of proving facts establishing that a loss or shrinkage of assets actually occurred." *In re Sendecky*, 283 B.R. 760, 765 (B.A.P. 8th Cir. 2002) (citation omitted).

Simply, based upon the aggregate of the above, Brown did not meet his burden of proof with respect to any asset. Brown's principal aim was directed at presumably lost or hidden VP commissions. Yet all VP commissions are accounted for, and the debtors' disclosures or explanations suffice for the balance of their assets.

### IV.  Conclusion

For the reasons stated herein, the relief sought in the Complaint is denied. The debtors are entitled to their discharge. The court shall enter a separate judgment to that effect.

47

IT IS SO ORDERED.

Dated this 14th day of December, 2023.

_____
HONORABLE RICHARD D. TAYLOR
UNITED STATES BANKRUPTCY JUDGE

cc:     Earl Devoe Rouse
        Stephanie Rouse
        Ron Brown
        Joel Hargis
        Stan V. Bond
        Richard L. Cox